SYSTEMATIC BUSINESS SERVICES, INC., a Missouri Corporation, et al., Respondents,

v.

Sean BRATTEN, Appellant.

No. WD 63777.

Missouri Court of Appeals, Western District.

Feb. 1, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 29, 2005.

Application for Transfer Denied May 31, 2005.

George A. Barton, Kansas City, MO, for appellant.

Clifford B. Wood, Kansas City, MO, for respondents.

Before: VICTOR C. HOWARD, P.J., ROBERT G. ULRICH and PATRICIA A. BRECKENRIDGE, JJ.

ROBERT G. ULRICH, J.

Sean Bratten appeals the judgment and permanent injunction that enforces the non-compete clause in an employment contract, which he signed on August 28, 2000, as a condition of his employment by Systematic Business Services, Inc. (SBSI). Both SBSI, wholly owned by LabOne, Inc., and LabOne sought and obtained injunctive relief that enjoined Mr. Bratten from engaging in the business of "attending physician statement" services (APS), which involves obtaining medical records from medical offices and hospitals relating to individuals who applied for insurance and providing the information to the insurance company clients with whom the applicant has applied for insurance coverage. The injunction precludes Mr. Bratten from engaging in the APS and/or medical records retrieval business for two years from and after July 11, 2003, the date of Mr. Bratten's dismissal from employment with LabOne for cause and from soliciting, accepting or diverting any APS and/or medical records retrieval business from or of any person or entity that was an APS customer of SBSI and/or LabOne as of July 11, 2003.

The judgment of the trial court granting the injunction is affirmed in part and reversed in part.

### Facts

Sean Bratten commenced his employment with SBSI on August 28, 2000, as an expert in the APS business. SBSI conducted an APS business for LabOne, the parent company. SBSI had developed a nationwide APS business with an extensive client list. The APS business requires specialized knowledge and depends significantly upon reputation with insurance companies within the industry. As a condition of his employment, Mr. Bratten signed an employment agreement with

SBSI that stated his duties and responsibilities to his employer; stated his compensation; provided a signing bonus of $5,000 to Mr. Bratten, to be paid by LabOne; contained restrictive covenants applicable both while employed and upon termination of his employment; and included a number of other provisions. The restrictive covenants were articulated in paragraph 8 of the agreement as a condition of employment and stated:

8. **Restrictive Covenants.** In consideration for employment with SBSI and in further consideration for the compensation provided for in Paragraph 4 and the post-termination payment, if any, provided for in Paragraph 10, Employee agrees that *during the term of employment pursuant to this Employment Agreement, and for a period of two (2) years after the termination for any reason of employment pursuant to this Employment Agreement,* Employee will not, without the prior written consent of SBSI, directly or indirectly, individually or in concert with others, or through the medium of any other corporation, partnership, syndicate, officer, director, agent, consultant, partner, member or otherwise:

a. solicit, accept, divert, or service, or attempt to solicit, accept, divert or service, any business similar to the type and character of business then engaged in by SBSI from any person, corporation or other entity who was as of the date of the termination of Employee's employment a customer of SBSI,

b. solicit, induce or encourage any employee, contractor or agent of SBSI to terminate employment or other relationship with SBSI or to compete with SBSI in any manner, or

c. compete with SBSI in the clinical or insurance laboratory testing business or any other businesses of SBSI at the date of termination of Employee's employment.

It is understood and agreed that Paragraph 8(c) shall apply only with respect to the following geographic area: All territory in which LabOne or its representatives or agents, as of the date of the termination of Employee's employment pursuant hereto, sells or offers for sale SBSI's products or services. (Emphasis added)

Paragraph 4(b) of the agreement states: *"Signing bonus.* LabOne will pay Employee a hiring bonus of $5,000 payable after the signing of this agreement." Upon Mr. Bratten's signing the agreement, LabOne, in accordance with the agreement, paid Mr. Bratten the signing bonus of $5,000.

When Mr. Bratten commenced his employment, he served as Operations Manager in charge of personnel that were conducting the APS retrieval for SBSI. While Operations Manager, for about two years, Mr. Bratten worked at both SBSI's Independence and Lee's Summit offices. In addition to supervising APS sales personnel, Mr. Bratten's duties included speaking to customers when they visited the company or by telephone, making sales trips and calling on clients at their places of business. He also conducted tours for clients and prospective clients that included describing the company's product. He was the product expert in the APS business for the companies.

In 2002, Mr. Bratten's position was changed. He was then located at the Lee's Summit location of SBSI. Because management received several complaints about Mr. Bratten from subordinate employees whom he directly supervised, management eliminated his supervisory duties

of APS sales personnel and created the position of Product Manager for him. The companies believed that he related well with clients, but concerns about his professional relationship with company employees resulted in Mr. Bratten being assigned to the Lenexa, Kansas office of LabOne. Although Mr. Bratten reported to a different person as his boss, he continued to assist the companies' sales people in selling the APS product, and he continued to maintain contact with the companies' APS clients. When a new client was obtained, for example, Mr. Bratten's job included engaging in conversations with the client to be certain the client was satisfied and interfacing with the APS department about development matters. From August 2002 until June 26, 2003, Mr. Bratten worked extensively with then current SBSI and LabOne APS customers. SBSI/LabOne had developed a broad nationwide client-base to which the companies sold and continue to sell their APS products, and Mr. Bratten was the principal company contact for all SBSI and LabOne APS customers. As Operations Manager of the companies' APS effort and later as Product Manager of the companies' APS business, Mr. Bratten had access to the entire APS customer list.

Mr. Bratten, while employed by SBSI/LabOne, formed a competing company entitled Allvenner Insurance Services Group in early 2003. He registered his business with the Missouri Secretary of State in February 2003. He also registered the name Allvenner.com. He produced advertising material that stated he had been developing a web-based management system for APS for over two years. He advertised his services as an APS medical records retrieval business. His business advertisement included "underwriting, personal history interviews, MVR's, criminal background checks, examinations, field investigations, surveillance, credit reporting, prescription history checks, and lab testing." LabOne provided the same advertised services.

In April 2003, while still employed by SBSI/LabOne, and unknown by his employer, Mr. Bratten engaged in his own competing business as Allvenner. He inquired whether certain SBSI and LabOne employees would be interested in joining his business. Among the SBSI and LabOne employees that he approached was the development manager of the confidential database and retrieval systems for SBSI/LabOne. Mr. Bratten requested that the employee provide him copies of SBSI/LabOne's APS database and other confidential and proprietary information for use in his own APS business, Allvenner. As Allvenner, Mr. Bratten successfully acquired business from a significant insurance company, an APS customer of SBSI/LabOne, and he processed in excess of two hundred orders for the customer in early 2003 while employed by SBSI/LabOne.

Mr. Bratten's competitive efforts for Allvenner were unknown by his employer on June 26, 2003, when, in accordance with paragraph 11(e) of the employment agreement, Mr. Bratten was informed that he was being terminated without cause effective July 26, 2003. He was told that he would receive a severance payment equivalent to six month's salary commencing July 26, 2003, in compliance with the provisions of paragraph 11(e) of the employment agreement. After he was informed of his termination but before July 26, 2003, Mr. Bratten solicited business from several additional SBSI/LabOne clients by e-mail. He also sent proposals to SBSI/LabOne clients informing them that they were being "overcharged" by SBSI/LabOne, and as Allvenner, he solicited their business, stating, "[h]ere's what I'll do for you for

any amount of volume to test us versus LabOne."

A client informed LabOne of Mr. Bratten's efforts, and LabOne sent Mr. Bratten a letter confirming a telephone call made to him by a company representative the same day informing him that his employment was being terminated immediately for cause, and that the provisions referenced in the June 26 letter were "no longer effective." The letter stated that the "cause" for terminating his employment was the company's learning of his breach of the restrictive covenants expressed in paragraph 8 of the employment agreement. The letter further stated that the company learned of the breach after it had informed him in its June 26, 2003, letter that it was terminating his employment without cause in accordance with paragraph 11(e) of the agreement. Mr. Bratten, although initially denying his involvement with Allvenner, acknowledged that the company was his business, and his employment was terminated for cause on July 11, 2003, in accordance with paragraph 11(d) of the employment agreement. Paragraph 11(d) states: *"Termination for cause.* Employee's employment may be involuntary terminated by SBSI at any time for cause. In the event that Employee is involuntarily terminated by SBSI for cause, SBSI shall thereafter have no further liability or obligation hereunder to Employee."

SBSI and LabOne obtained a temporary restraining order from the trial court on July 24, 2003, directing Mr. Bratten to desist his APS business activities, and later the companies obtained a preliminary injunction following a hearing. The court, in two paragraphs, made permanent its temporary order enjoining Mr. Bratten from "a. engaging in the APS and medical records retrieval business for a period of two years from July 11, 2003, and b. [from]

soliciting, accepting or diverting any APS and/or medical records retrieval from or of any person or entity which (sic) was an APS customer of SBSI and/or LabOne as of July 11, 2003 . . . ." The court effectively enforced the noncompete provisions of the employment contract and SBSI's invocation of paragraph 11(d) of the employment agreement that the company was not liable to Mr. Bratten for additional compensation under paragraph 11(e). The injunction was entered as the court's judgment. Mr. Bratten appeals the judgment.

## Standard of Review

■■■ An action seeking an injunction is an action in equity. The standard of review in a court-tried action in equity is that of a judge tried case: the trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *L.B. v. State Comm. of Psychologists,* 912 S.W.2d 611, 616 (Mo.App.W.D.1995).

## Points on Appeal

Mr. Bratten asserts four points on appeal. He claims as his first point that SBSI breached the August 28, 2000, employment agreement by failing to pay him the severance payment provided for in the agreement because he was terminated without cause from his employment with SBSI in July 2002, when he was transferred from SBSI's Lee's Summit office to LabOne's Lenexa, Kansas office. In his second point, Mr. Bratten claims that the covenant not to compete (paragraph 8 of the employment agreement entitled "Restrictive Covenants") is not legally enforceable because the geographical area encompassed by it is unrestricted and unreasonably broad and, therefore, the trial

court erred by enforcing the restrictive covenant. He claims as his third point that he had insufficient customer contacts and was unable to influence customers of SBSI while employed by the company to justify enforcement of the restrictive covenant, and the trial court, therefore, erred in enforcing the covenant not to compete that restricts his contact with SBSI customers. Finally, Mr. Bratten claims that trial court erred in enforcing the restrictive covenant within the employment agreement because LabOne lacked standing to enforce the restrictive covenants because SBSI and he were the parties to the agreement and LabOne was not a third-party beneficiary of the restrictive covenants.

## Point 1: SBSI did not commit a breach of the employment agreement before Mr. Bratten's employment was terminated on July 11, 2003

Mr. Bratten claims that the trial court erred in enforcing the covenant not to compete expressed by paragraph 8 of the employment agreement because SBSI committed a prior breach of the agreement by failing to pay him $25,500 severance payment as provided in paragraph 11(e), claiming that he was terminated without cause from his employment with SBSI in July 2002, when he was directed to leave SBSI's Lee's Summit office and to work from LabOne's Lenexa, Kansas, office. Thus, effectively, Mr. Bratten asserts that when he was told that he was no longer to supervise personnel at SBSI's Lee's Summit office and that he was to perform assigned duties from LabOne's Lenexa office, his employment with SBSI terminated without cause, he became an employee of LabOne, and paragraph 11(e) of his employment contract with SCSI, which provided for additional compensation, was applicable. The practical effect of Mr. Bratten's position is that because

his employment was terminated in July 2002 when he was directed to report to LabOne's Lenexa office, the employment agreement that he had signed was terminated and the trial court effectively extended the restrictions imposed on him by the agreement beyond the two years from July 2002 provided in paragraph 8 to two years from July 11, 2003, the date he was informed of his immediate discharge for cause.

Respondents assert that Mr. Bratten's employment as Product Manager for SBSI was not terminated without cause and that his employment continued, but with LabOne. Respondents claim they constituted Mr. Bratten's joint employers, and as such, Mr. Bratten was not terminated in July 2002 but was simply posted to the Lenexa, Kansas, office rather than SCSI's office in Lee's Summit to continue working on APS matters for the companies.

Whether two or more employers concurrently employ a worker is occasionally an issue in workers' compensation cases or in other types of cases where a worker's entitlement to benefits or the exercise of someone's legal rights is dependent on the answer. *See e.g. Leach v. Bd. of Police Comm'rs of Kansas City,* 118 S.W.3d 646, 651 (Mo.App. W.D. 2003)(where police officer was jointly employed by security company and board of police commissioners when killed allowing dependents to collect from Second Injury Fund); *Watkins v. Bi–State Dev. Agency,* 924 S.W.2d 18, 21 (Mo.App. E.D.1996), *overruled on other grounds by Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003)(where claimant before Labor and Industrial Relations Commission seeking workers' compensation benefits held an employee of both city and construction company). Joint employment may occur when an employee is doing

work for two or more employers. *Leach,* 118 S.W.3d at 650. The employee's employers are enjoying the benefit resulting from the employee's "joint service." *Id.* This court in *Leach* stated, "That the focus should be on service rendered rather than benefit conferred is reiterated in the definition of joint employment. Joint employment occurs when an employee, under contract with two or more employers and under their simultaneous control, performs for each employer services that are the same or closely related." *Id.* Under Missouri Workers' Compensation Law, when determining whether a claimant is a worker employed and entitled to receive benefits under the law, whether the claimed employer had a right to control the means and manner of the service provided by the worker is pivotal when determining the employment relationship. *Watkins,* 924 S.W.2d at 21.

SBSI and LabOne assert that the August 2000 employment contract signed by Mr. Batten effectively acknowledges his joint employment by both SBSI and LabOne. The contract makes numerous references to both SBSI and LabOne in their capacity of employer and acknowledges that both companies exercise control over Mr. Bratten's work. The employment agreement commences by stating that it is an agreement between SBSI, "a subsidiary of LabOne, Inc." and Mr. Bratten. Paragraph 3 recites Mr. Bratten's duties and responsibilities. Explicitly stated in the agreement is the provision that Mr. Bratten shall perform professional duties as SBSI or the Officers or Board of Directors of LabOne require, and that he shall be loyal to both SBSI and LabOne. The paragraph states:

> Employee shall serve as Manager, APS Department, or in such other capacities as SBSI or the Officers or Board of Directors of LabOne may from time to time in their discretion prescribe, shall

perform all duties incidental to such positions while held by Employee and shall cooperate fully with the Board of Directors and Officers of LabOne. Employee shall devote his complete loyalty to SBSI and LabOne and all of his business time, attention and energy to the performance of such duties and responsibilities.

Another provision asserted LabOne's obligation to Mr. Bratten, and another required Mr. Bratten's commitment of confidentiality regarding not only SBSI's secrets but also LabOne's. The $5,000 signing bonus previously referenced in paragraph 4(b) specifically provided that LabOne would pay the sum after Mr. Bratten signed the agreement. LabOne, not SBSI, paid the bonus. Paragraph 7 of the agreement imposed confidentiality restrictions. The restrictions provided that Mr. Bratten would "hold in trust and confidence ... all trade secrets, proprietary information and confidential information ... acquired by [him] concerning LabOne, Inc. or LabOne of Canada, SBSI, or other affiliates of LabOne[.]"

The employment agreement stated employee/employer responsibilities applicable to Mr. Bratten, SBSI, and LabOne. Mr. Bratten, in paragraph 3, entitled Duties and Responsibilities, agreed that he would serve in such capacities as SBSI or LabOne would, "in their discretion" determine, and he agreed to cooperate with LabOne, devoting his complete loyalty to both. LabOne paid the signing bonus as the contract provided it would even though it was not a signatory to the agreement. Mr. Bratten pledged confidentiality of SBSI's and LabOne's secrets. Mr. Bratten continued to work on SBSI's APS business after his position was redefined, and he was directed to work from LabOne's Lenexa office. Substantial evidence was

presented that Mr. Bratten's employment was not terminated when his position was modified and he was directed to work on APS business at the LabOne office in Lenexa, Kansas. The trial court did not err in finding that SBSI did not commit a material breach of contract. Point one is denied.

### Points 2 & 3: Mr. Bratten had substantial and continuing contact with SBSI and LabOne APS customers; part b. of the court's judgment enforcing the non-compete agreement is not impermissibly geographically unrestrictive, but part a. is

Mr. Bratten claims as his second point on appeal that the trial court erred in entering its permanent injunction enforcing the covenant not to compete (subparagraphs 8(a) and 8(c) of the employment agreement) because the scope of the covenant (and impliedly the court's judgment) is geographically unrestricted and, therefore, is not legally enforceable as a matter of law. He asserts that the court's judgment improperly prohibits him from "competing with SBSI in the clinical or insurance laboratory testing business or any other business of SBSI for a period of two years" following July 11, 2003, the date his employment was terminated, and is illegally unrestricted geographically.

Paragraph a. of the court's judgment precludes Mr. Bratten, and others acting in his behalf, from "engaging in the APS and/or medical records retrieval business for a period of two years from and after July 11, 2003." Paragraph b. precludes Mr. Bratten from "soliciting, accepting or diverting any APS and/or medical records retrieval business from or of any person or entity which was an APS customer of SBSI and/or LabOne as of July 11, 2003,

which shall include the persons and entities on [SBSI and LabOne's list of APS customers]."[1]

Temporary and spatially limited restrictive covenants not to compete that protect an employer's legitimate protectable interests from unfair competition by a former employee and that do not impose unreasonable restraints on the employee are enforceable. *AEE–EMF, Inc. v. Passmore*, 906 S.W.2d 714, 719 (Mo.App. W.D. 1995). Two legitimate "protectable interests" recognized by Missouri courts are customer contacts and trade secrets. *Id.* Whether the restrictive covenant's restraints are reasonable is determined by considering "all attending circumstances and [whether] enforcement serves the employer's legitimate interests." *Id.* A restrictive covenant that limits a party's pursuit of an occupation is in restraint of trade, and, in addition to protecting the employer's legitimate interests, the covenant must also be reasonable as to time and space to be enforceable. *Id.* (citing *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 73–74 (Mo. banc 1985)). An employer cannot extract a restrictive covenant from an employee merely to protect itself from competition, but a limited time and geographical restraint may be deemed reasonable and enforceable if the employer's legitimate protectible interests, such as "stock of customers" and the company's goodwill, are served. *Steamatic of Kansas City, Inc. v. Rhea*, 763 S.W.2d 190, 192 (Mo.App. W.D.1988). Protection of a former employer's legitimate business interests and not punishment of the former employee is the essence of the law. *AEE– EMF*, 906 S.W.2d at 720. "The standard for determining the reasonableness of the geographic scope of a restrictive covenant

---

1. SBSI and LabOne's customer list as of July 11, 2003, was introduced as Exhibit 27 and is referenced in the court's Permanent Injunction and Final Judgment.

is whether it is no greater than fairly required for protection." *Schott v. Beussink*, 950 S.W.2d 621 (Mo.App. E.D.1997). Noncompetition agreements are not favored in the law, and the party attempting to enforce a noncompetition agreement has the burden of demonstrating both the necessity to protect the claimant's legitimate interests and that the agreement is reasonable as to time and space. *AEE–EMF*, 906 S.W.2d at 719.

 The instant case is similar to *Schott v. Beussink*, 950 S.W.2d 621 (Mo. App. E.D.1997). In *Schott*, partners in an accounting firm appealed the trial court's denial of their petition to enforce the restrictive covenant precluding former employees from soliciting employer's clients for two years following termination of employees' employment with employer. The trial court determined that the covenant, which prevented employees from performing accounting services for employer's clients whom employees served while employer's employees, was unenforceable because the covenant lacked spatial (geographical) limitations.[2] The Eastern District distinguished two cases in which the restrictive covenants were not enforced because they prevented employees from competing with their former employers for two years after termination of employment without limitation to a stated area. The Supreme Court in *National Motor Club of Mo., Inc. v. Noe*, 475 S.W.2d 16, 22 (Mo.1972), found unenforceable the restrictive covenant at issue because it was not reasonably restricted to any geographic area. The Court also noted that the covenant did not reason-

ably limit the prohibited competition. The Southern District in *Prentice v. Williams*, 324 S.W.2d 466, 470 (Mo.App. S.D.1959), found the first of two restrictive covenants considered in the case, which limited the employee's occupation post employment as to time but not geographic area, unenforceable.

Noting that the courts in *Noe* and *Prentice* did not specifically hold that a restrictive covenant is unenforceable just because it lacks geographical or spatial limitations, the court in *Schott* recognized that the former employee accountants were restricted from soliciting their former employer's clients with whom they had done business during the fifteen-month period preceding the termination of their employment contracts. *Schott*, 950 S.W.2d at 626–27. Significant was the fact that the restriction did not universally deny the former employees the opportunity to engage in the practice of accounting. *Id.* at 626. The court stated, "[A]lthough not stated in express geographical terms, the limitation of the restrictive covenant applies to employer's clients with whom the employer had done business during the fifteen-month period preceding the termination of the contracts." *Id.* at 626–27. Thus, the court concluded that the absence of geographical limitation in the restrictive covenant being considered did not render it void. Quoting from *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213 (Ind. App.1982), the court said, "[A]s the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation ex-

---

**2.** The trial court found that applying restrictive covenants to accountants violates public policy. The Eastern District rejected the trial court's finding and recognized that an employer has a "proprietary right in its stock of customers and their good will, and if the covenant is otherwise reasonable, the court will protect the asset against appropriation by an employee." *Schott*, 950 S.W.2d at 625. The appellate court found that the trial court erred when it found that restrictive covenants between accountants are unenforceable because of public policy. *Id.*

pressed in territorial terms decreases."
*Id.* at 627.

Like *Schott,* the restrictions in this case are not stated in geographical terms. The lack of a territorial limitation does not render the restrictions unenforceable, however, because the restrictions preclude Mr. Bratten from soliciting business from SBSI customers. Mr. Bratten asserts as point three that he had limited contact with customers while employed by Respondents and was not in a position to influence relevant contact persons located at SBSI's customers. He, therefore, claims by implication that the courts' injunction and final judgment precluding him from soliciting Respondents' APS customers is impermissibly restrictive.

Mr. Bratten acknowledges that "the rationale for protecting 'customer contacts' is that, in the sales industry, a customer's goodwill toward a company is often attached to the employer's individual sales representative, and the employer's product or service becomes associated in the customer's mind with that representative." *Easy Returns Midwest, Inc. v. Schultz,* 964 S.W.2d 450, 453 (Mo.App. E.D.1998). "The sales employee is thus placed in a position to exert a special influence over the customer and entice that customer's business away from the employer." *Id.* "Because it is this special influence that justifies enforcement of non-compete covenants, the quality, frequency and duration of employee's exposure to the customers is of crucial importance in determining the reasonableness of the restriction." *Id.*

Also affecting employer customer contacts is the employer's customer list. Customer contacts are a protectable commodity of a former employer, and a former employer attempting to enforce an express restrictive covenant need not show that the customer list is secret. *AEE–*

*EMF,* 906 S.W.2d at 720. Customer contacts are a protectable commodity because goodwill develops between the customers and the employer through its employees whose job it is to meet and converse with the customer while representing the employer. *Id.* The resulting goodwill is essential to the employer's success and is a reason that the employee is remunerated. *Id.* Sales result from the goodwill that develops. The employer, therefore, has a protectable right in both customers and goodwill. *Id.* The former employer need not show actual damages to enforce the covenant if the covenant is lawful and the opportunity to influence employer's customers exists. *Id.*

The trial court made specific findings that are applicable to Mr. Bratten's second and third points, each of which is supported by substantial evidence. LabOne engages in the APS business through its subsidiary SBSI, and SBSI's and LabOne's APS customers are the same. Mr. Bratten had substantial and ongoing contact with SBSI's APS customers when employed by Respondents, including many of its largest APS customers. Mr. Bratten became thoroughly knowledgeable about SBSI's and LabOne's APS business and computer systems used to process APS business, and these systems were developed in-house by LabOne and SBSI and are proprietary. While employed by Respondents, and in breach of the restrictive covenant (paragraph 8), Mr. Bratten began establishing his own APS business (Allvenner Insurance Services Group); met, through his employment, a SBSI and LabOne insurance company customer; and, as Allvenner, actively engaged in APS business with it. Between mid-April 2003, and the July 2003 termination of his employment with Respondents for cause, Mr. Bratten, acting in his own interests as competitor Allvenner while still employed

by Respondents, processed over 200 APS orders for the customer. Contrary to Mr. Bratten's claim, he had substantial and significant contact with Respondents' customers and demonstrated by his conduct in soliciting and acquiring APS business from at least one of Respondents' customers that he was in position to influence decision makers located at Respondents' customers.

The interests that SBSI and LabOne are attempting to protect by application of the restrictive covenants and the interests the court protects in paragraph b. of its judgment are legitimate protectable interests. Paragraph 8(a) of the employment agreement constrains Mr. Bratten from soliciting, accepting, diverting, or servicing, or attempting to do so, entities that were customers of SBSI on July 11, 2003, when Mr. Bratten was discharged for cause. Mr. Bratten's employment permitted him to access Respondents' APS customer list, and the evidence reflects that he used this information to commence and operate his own APS business as Allvenner while employed by Respondents in contravention of paragraph 8 of the agreement. The restrictions expressed in paragraph b. of the court's judgment are limited to two years as expressed by paragraph 8 of the employment agreement and implied by paragraph a. of the court's judgment, and Mr. Bratten does not claim that the two year tenure of the restriction is excessive. The restrictions expressed in paragraph b. of the judgment are, therefore, reasonable as to time and space, and are not punishment for Mr. Bratten's misconduct.

The restrictions expressed in paragraph a. of the court's judgment preclude Mr. Bratten from engaging in the APS and/or medical records retrieval business for a period of two years from and after July 11, 2003, without restriction. Thus, the prohibition prevents Mr. Bratten from engaging in such business anywhere for two years. Paragraph a. of the court's judgment is, therefore, universal and without geographic limitation and is too broad and unrestricted. Paragraph a. of the trial court's judgment is, therefore, stricken. The points are granted in part and denied in part.

**Point 4: SBSI had standing to seek enforcement of the restrictive covenants, and whether LabOne had standing need not be considered**

█ Mr. Bratten claims as his final point that the trial court erred in enforcing the restrictive covenant within the employment agreement because LabOne lacked standing to enforce the restrictive covenants for the reason that SBSI and he were the parties to the agreement, and LabOne was not a third-party beneficiary. Both SBSI and LabOne filed suit as plaintiffs. Whether LabOne had standing to sue need not be addressed because SBSI had standing as a party to enforce the provisions of the agreement that benefit LabOne. Mr. Bratten's final point need not be addressed. The point is denied.

The court's judgment is affirmed in part and reversed in part in accordance with this opinion.

HOWARD, P.J. and
BRECKENRIDGE, J. concur.